Affiliate, and any applicable provisions of the corporate law of the state in which the Company or the Affiliate is incorporated, as the case may be.

(e)   **Change in Time Commitment**.   In the event a Participant's regular level of time commitment in the performance of his or her services for the Company and any Affiliates is reduced (for example, and without limitation, if the Participant is an Employee of the Company and the Employee has a change in status from a full-time Employee to a part-time Employee) after the date of grant of any Award to the Participant, the Board has the right in its sole discretion to (x) make a corresponding reduction in the number of shares or cash amount subject to any portion of such Award that is scheduled to vest or become payable after the date of such change in time commitment, and (y) in lieu of or in combination with such a reduction, extend the vesting or payment schedule applicable to such Award. In the event of any such reduction, the Participant will have no right with respect to any portion of the Award that is so reduced or extended.

(f)   **Incentive Stock Option Limitations**.    To the extent that the aggregate Fair Market Value (determined at the time of grant) of Common Stock with respect to which Incentive Stock Options are exercisable for the first time by any Optionholder during any calendar year (under all plans of the Company and any Affiliates) exceeds one hundred thousand dollars ($100,000) (or such other limit established in the Code) or otherwise does not comply with the rules governing Incentive Stock Options, the Options or portions thereof that exceed such limit (according to the order in which they were granted) or otherwise do not comply with such rules will be treated as Nonstatutory Stock Options, notwithstanding any contrary provision of the applicable Option Agreement(s).

(g)   **Investment Assurances**.    The Company may require a Participant, as a condition of exercising or acquiring Common Stock under any Award, (i) to give written assurances satisfactory to the Company as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Company who is knowledgeable and experienced in financial and business matters and that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Award; and (ii) to give written assurances satisfactory to the Company stating that the Participant is acquiring Common Stock subject to the Award for the Participant's own account and not with any present intention of selling or otherwise distributing the Common Stock. The foregoing requirements, and any assurances given pursuant to such requirements, will be inoperative if (A) the issuance of the shares upon the exercise or acquisition of Common Stock under the Stock Award has been registered under a then currently effective registration statement under the Securities Act, or (B) as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws. The Company may, upon advice of counsel to the Company, place legends on stock certificates issued under the Plan as such counsel deems necessary or appropriate in order to comply with applicable securities laws, including, but not limited to, legends restricting the transfer of the Common Stock.

(h)   **Withholding Obligations**.    Unless prohibited by the terms of an Award Agreement, the Company may, in its sole discretion, satisfy any federal, state or local tax withholding obligation relating to an Award by any of the following means or by a combination of such means: (i) causing the Participant to tender a cash payment; (ii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to the Participant in connection with the Stock Award; *provided* , *however* , that no shares of Common Stock are withheld with a value exceeding the minimum amount of tax required to be withheld by law (or such lesser amount as may be necessary to avoid classification of the Stock Award as a liability for financial accounting purposes); (iii) withholding cash from an Award settled in cash; (iv) withholding payment from any amounts otherwise payable to the Participant; or (v) by such other method as may be set forth in the Award Agreement.

A-13

(i)   Electronic Delivery .   Any reference herein to a "written" agreement or document will include any agreement or document delivered electronically, filed publicly at www.sec.gov (or any successor website thereto) or posted on the Company's intranet (or other shared electronic medium controlled by the Company to which the Participant has access).

(j)   Deferrals.   To the extent permitted by applicable law, the Board, in its sole discretion, may determine that the delivery of Common Stock or the payment of cash, upon the exercise, vesting or settlement of all or a portion of any Award may be deferred and may establish programs and procedures for deferral elections to be made by Participants. Deferrals by Participants will be made in accordance with Section 409A of the Code. Consistent with Section 409A of the Code, the Board may provide for distributions while a Participant is still an employee or otherwise providing services to the Company. The Board is authorized to make deferrals of Awards and determine when, and in what annual percentages, Participants may receive payments, including lump sum payments, following the Participant's termination of Continuous Service, and implement such other terms and conditions consistent with the provisions of the Plan and in accordance with applicable law.

(k)   Compliance with Section 409A of the Code.   To the extent that the Board determines that any Award granted hereunder is subject to Section 409A of the Code, the Award Agreement evidencing such Award shall incorporate the terms and conditions necessary to avoid the consequences specified in Section 409A(a)(1) of the Code. To the extent applicable, the Plan and Award Agreements shall be interpreted in accordance with Section 409A of the Code. Notwithstanding anything to the contrary in this Plan (and unless the Award Agreement specifically provides otherwise), if the shares of Common Stock are publicly traded and a Participant holding an Award that constitutes "deferred compensation" under Section 409A of the Code is a "specified employee" for purposes of Section 409A of the Code, no distribution or payment of any amount shall be made upon a "separation from service" before a date that is six (6) months following the date of such Participant's "separation from service" (as defined in Section 409A of the Code without regard to alternative definitions thereunder) or, if earlier, the date of the Participant's death.

(l)   Clawback/Recovery .   All Awards granted under the Plan will be subject to recoupment in accordance with any clawback policy that the Company is required to adopt pursuant to the listing standards of any national securities exchange or association on which the Company's securities are listed or as is otherwise required by the Dodd-Frank Wall Street Reform and Consumer Protection Act or other applicable law. In addition, the Board may impose such other clawback, recovery or recoupment provisions in an Award Agreement as the Board determines necessary or appropriate, including but not limited to a reacquisition right in respect of previously acquired shares of Common Stock or other cash or property upon the occurrence of Cause. No recovery of compensation under such a clawback policy will be an event giving rise to a right to resign for "good reason" or "constructive termination" (or similar term) under any agreement with the Company.

9.   Adjustments upon Changes in Common Stock; Other Corporate Events.

(a)   Capitalization Adjustments .   In the event of a Capitalization Adjustment, the Board will appropriately and proportionately adjust: (i) the class(es) and maximum number of securities subject to the Plan pursuant to Section 3(a), (ii) the class(es) and maximum number of securities that may be issued pursuant to the exercise of Incentive Stock Options pursuant to Section 3(c), (iii) the class(es) and maximum number of securities that may be awarded to any person pursuant to Sections 3(d), and (iv) the class(es) and number of securities and price per share of stock subject to outstanding Stock Awards. The Board will make such adjustments, and its determination will be final, binding and conclusive.

(b)   Dissolution or Liquidation .   Except as otherwise provided in the Stock Award Agreement, in the event of a dissolution or liquidation of the Company, all outstanding Stock Awards (other than

Stock Awards consisting of vested and outstanding shares of Common Stock not subject to a forfeiture condition or the Company's right of repurchase) will terminate immediately prior to the completion of such dissolution or liquidation, and the shares of Common Stock subject to the Company's repurchase rights or subject to a forfeiture condition may be repurchased or reacquired by the Company notwithstanding the fact that the holder of such Stock Award is providing Continuous Service; *provided*, *however*, that the Board may, in its sole discretion, cause some or all Stock Awards to become fully vested, exercisable and/or no longer subject to repurchase or forfeiture (to the extent such Stock Awards have not previously expired or terminated) before the dissolution or liquidation is completed but contingent on its completion.

(c)   **Corporate Transactions; Change in Control.**   The following provisions will apply to Stock Awards in the event of a Corporate Transaction or Change in Control unless otherwise provided in the instrument evidencing the Stock Award or any other written agreement between the Company or any Affiliate and the Participant or unless otherwise expressly provided by the Board at the time of grant of a Stock Award.

(i)   **Stock Awards May Be Assumed.**   Except as otherwise stated in the Stock Award Agreement, in the event of a Corporate Transaction or Change in Control, any surviving corporation or acquiring corporation (or the surviving or acquiring corporation's parent company) may assume or continue any or all Stock Awards outstanding under the Plan or may substitute similar stock awards for Stock Awards outstanding under the Plan (including but not limited to, awards to acquire the same consideration paid to the stockholders of the Company pursuant to the Corporate Transaction or Change in Control), and any reacquisition or repurchase rights held by the Company in respect of Common Stock issued pursuant to Stock Awards may be assigned by the Company to the successor of the Company (or the successor's parent company, if any), in connection with such Corporate Transaction or Change in Control. A surviving corporation or acquiring corporation (or its parent) may choose to assume or continue only a portion of a Stock Award or substitute a similar stock award for only a portion of a Stock Award, or may choose to assume or continue the Stock Awards held by some, but not all Participants. The terms of any assumption, continuation or substitution will be set by the Board.

(ii)   **Stock Awards Held by Current Participants.**   In the event of a Corporate Transaction or Change in Control in which the surviving corporation or acquiring corporation (or its parent company) does not assume or continue such outstanding Stock Awards or substitute similar stock awards for such outstanding Stock Awards, then with respect to Stock Awards that have not been assumed, continued or substituted and that are held by Participants whose Continuous Service has not terminated prior to the effective time of the Corporate Transaction or Change in Control (referred to as the "*Current Participants*"), the vesting of such Stock Awards (and, with respect to Options and SARs, the time when such Stock Awards may be exercised) will be accelerated in full to a date prior to the effective time of such Corporate Transaction or Change in Control (contingent upon the effectiveness of the Corporate Transaction or Change in Control) as the Board will determine (or, if the Board does not determine such a date, to the date that is five (5) days prior to the effective time of the Corporate Transaction), and such Stock Awards will terminate if not exercised (if applicable) at or prior to the effective time of the Corporate Transaction or Change in Control, and any reacquisition or repurchase rights held by the Company with respect to such Stock Awards will lapse (contingent upon the effectiveness of the Corporate Transaction or Change in Control).

(iii)   **Stock Awards Held by Persons other than Current Participants.**   In the event of a Corporate Transaction or Change in Control in which the surviving corporation or acquiring corporation (or its parent company) does not assume or continue such outstanding Stock Awards or substitute similar stock awards for such outstanding Stock Awards, then with respect to Stock Awards that have not been assumed, continued or substituted and that are held by persons other

A-15

than Current Participants, the vesting of such Stock Awards (and, with respect to Options and SARs, the time when such Stock Awards may be exercised) will not be accelerated and such Stock Awards (other than a Stock Award consisting of vested and outstanding shares of Common Stock not subject to the Company's right of repurchase) will terminate if not exercised (if applicable) prior to the effective time of the Corporate Transaction or Change in Control; *provided*, *however*, that any reacquisition or repurchase rights held by the Company with respect to such Stock Awards will not terminate and may continue to be exercised notwithstanding the Corporate Transaction or Change in Control.

(iv)   **Payment for Stock Awards in Lieu of Exercise.**   Notwithstanding the foregoing, in the event a Stock Award will terminate if not exercised prior to the effective time of a Corporate Transaction or Change in Control, the Board may provide, in its sole discretion, that the holder of such Stock Award may not exercise such Stock Award but will receive a payment, in such form as may be determined by the Board, equal in value, at the effective time of the Corporate Transaction or Change in Control, to the excess, if any, of (A) the value of the property the Participant would have received upon the exercise of the Stock Award (including, at the discretion of the Board, any unvested portion of such Stock Award), over (B) any exercise price payable by such holder in connection with such exercise.

(d)   **Change in Control.**   A Stock Award may be subject to additional acceleration of vesting and exercisability upon or after a Change in Control as may be provided in the Stock Award Agreement for such Stock Award or as may be provided in any other written agreement between the Company or any Affiliate and the Participant, but in the absence of such provision, no such acceleration will occur.

**10.   Plan Term; Earlier Termination or Suspension of the Plan.**

(a)   The Board may suspend or terminate the Plan at any time. No Incentive Stock Option will be granted after the tenth (10th) anniversary of the earlier of (i) the date the Plan is adopted by the Board, or (ii) the date the Plan is approved by the stockholders of the Company. No Awards may be granted under the Plan while the Plan is suspended or after it is terminated.

(b)   **No Impairment of Rights.**   Suspension or termination of the Plan will not impair rights and obligations under any Award granted while the Plan is in effect except with the written consent of the affected Participant or as otherwise permitted in the Plan.

**11.   Effective Date of Plan.**

This Plan will become effective on the Effective Date.

**12.   Choice of Law.**

The laws of the State of California will govern all questions concerning the construction, validity and interpretation of this Plan, without regard to that state's conflict of laws rules.

**13.   Definitions.**

As used in the Plan, the following definitions will apply to the capitalized terms indicated below:

(a)   "*Affiliate*" means, at the time of determination, any "parent" or "subsidiary" of the Company as such terms are defined in Rule 405. The Board will have the authority to determine the time or times at which "parent" or "subsidiary" status is determined within the foregoing definition.

(b)   "*Award*" means a Stock Award or a Performance Cash Award.

(c)   "*Award Agreement*" means a written agreement between the Company and a Participant evidencing the terms and conditions of an Award.

(d)   "*Board*" means the Board of Directors of the Company.

A-16

(e)   " *Capitalization Adjustment* " means any change that is made in, or other events that occur with respect to, the Common Stock subject to the Plan or subject to any Stock Award after the Effective Date without the receipt of consideration by the Company through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, large nonrecurring cash dividend, stock split, reverse stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or any similar equity restructuring transaction, as that term is used in Statement of Financial Accounting Standards Board Accounting Standards Codification Topic 718 (or any successor thereto). Notwithstanding the foregoing, the conversion of any convertible securities of the Company will not be treated as a Capitalization Adjustment.

(f)   " *Cause* " will have the meaning ascribed to such term in any written agreement between the Participant and the Company defining such term and, in the absence of such agreement, such term means, with respect to a Participant, the occurrence of any of the following events: (i) such Participant's commission of any felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (ii) such Participant's attempted commission of, or participation in, a fraud or act of dishonesty against the Company; (iii) such Participant's intentional, material violation of any contract or agreement between the Participant and the Company or of any statutory duty owed to the Company; (iv) such Participant's unauthorized use or disclosure of the Company's confidential or proprietary information or trade secrets or the confidential or proprietary information or trade secrets of any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company; or (v) such Participant's gross misconduct. The determination that a termination of the Participant's Continuous Service is either for Cause or without Cause will be made by the Company, in its sole discretion. Any determination by the Company that the Continuous Service of a Participant was terminated with or without Cause for the purposes of outstanding Awards held by such Participant will have no effect upon any determination of the rights or obligations of the Company or such Participant for any other purpose. The foregoing definition does not in any way limit the Company's ability to terminate a Participant's Continuous Service at any time, and the term "Company" will be interpreted herein to include any Affiliate or successor thereto, if appropriate.

(g)   " *Change in Control* " means the occurrence, in a single transaction or in a series of related transactions, of any one or more of the following events:

(i)   any Exchange Act Person becomes the Owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities other than by virtue of a merger, consolidation or similar transaction. Notwithstanding the foregoing, a Change in Control will not be deemed to occur (A) on account of the acquisition of securities of the Company directly from the Company, (B) on account of the acquisition of securities of the Company by an investor, any affiliate thereof or any other Exchange Act Person that acquires the Company's securities in a transaction or series of related transactions the primary purpose of which is to obtain financing for the Company through the issuance of equity securities, or (C) solely because the level of Ownership held by any Exchange Act Person (the " *Subject Person* ") exceeds the designated percentage threshold of the outstanding voting securities as a result of a repurchase or other acquisition of voting securities by the Company reducing the number of shares outstanding, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of voting securities by the Company, and after such share acquisition, the Subject Person becomes the Owner of any additional voting securities that, assuming the repurchase or other acquisition had not occurred, increases the percentage of the then outstanding voting securities Owned by the Subject Person over the designated percentage threshold, then a Change in Control will be deemed to occur;

A-17

(ii)   there is consummated a merger, consolidation or similar transaction involving (directly or indirectly) the Company and, immediately after the consummation of such merger, consolidation or similar transaction, the stockholders of the Company immediately prior thereto do not Own, directly or indirectly, either (A) outstanding voting securities representing more than fifty percent (50%) of the combined outstanding voting power of the surviving Entity in such merger, consolidation or similar transaction or (B) more than fifty percent (50%) of the combined outstanding voting power of the parent of the surviving Entity in such merger, consolidation or similar transaction, in each case in substantially the same proportions as their Ownership of the outstanding voting securities of the Company immediately prior to such transaction;

(iii)   there is consummated a sale, lease, exclusive license or other disposition of all or substantially all of the consolidated assets of the Company and its Subsidiaries, other than a sale, lease, license or other disposition of all or substantially all of the consolidated assets of the Company and its Subsidiaries to an Entity, more than fifty percent (50%) of the combined voting power of the voting securities of which are Owned by stockholders of the Company in substantially the same proportions as their Ownership of the outstanding voting securities of the Company immediately prior to such sale, lease, license or other disposition; or

(iv)   individuals who, on the date the Plan is adopted by the Board, are members of the Board (the " *Incumbent Board* ") cease for any reason to constitute at least a majority of the members of the Board; *provided, however* , that if the appointment or election (or nomination for election) of any new Board member was approved or recommended by a majority vote of the members of the Incumbent Board then still in office, such new member will, for purposes of this Plan, be considered as a member of the Incumbent Board.

Notwithstanding the foregoing definition or any other provision of this Plan, the term Change in Control will not include a sale of assets, merger or other transaction effected exclusively for the purpose of changing the domicile of the Company.

(h)   " *Code* " means the Internal Revenue Code of 1986, as amended, including any applicable regulations and guidance thereunder.

(i)   " *Committee* " means a committee of one (1) or more Directors to whom authority has been delegated by the Board in accordance with Section 2(c).

(j)   " *Common Stock* " means the common stock of the Company.

(k)   " *Company* " means Kratos Defense & Security Solutions, Incorporated, a Delaware corporation; *provided* , that in the event the Company reincorporates to another jurisdiction, all references to the term "Company" shall refer to the Company in such new jurisdiction.

(l)   " *Consultant* " means any person, including an advisor, who is (i) engaged by the Company or an Affiliate to render consulting or advisory services and is compensated for such services, or (ii) serving as a member of the board of directors of an Affiliate and is compensated for such services. However, service solely as a Director, or payment of a fee for such service, will not cause a Director to be considered a "Consultant" for purposes of the Plan. Notwithstanding the foregoing, a person is treated as a Consultant under this Plan only if a Form S-8 Registration Statement under the Securities Act is available to register either the offer or the sale of the Company's securities to such person.

(m)   " *Continuous Service* " means that the Participant's service with the Company or an Affiliate, whether as an Employee, Director or Consultant, is not interrupted or terminated. A change in the capacity in which the Participant renders service to the Company or an Affiliate as an Employee, Director or Consultant or a change in the Entity for which the Participant renders such service, provided that there is no interruption or termination of the Participant's service with the Company or an Affiliate, will not terminate a Participant's Continuous Service; *provided, however,* that if the Entity

A-18

for which a Participant is rendering services ceases to qualify as an Affiliate, as determined by the Board, in its sole discretion, such Participant's Continuous Service will be considered to have terminated on the date such Entity ceases to qualify as an Affiliate. For example, a change in status from an Employee of the Company to a Consultant of an Affiliate or to a Director will not constitute an interruption of Continuous Service. To the extent permitted by law, the Board or the chief executive officer of the Company, in that party's sole discretion, may determine whether Continuous Service will be considered interrupted in the case of (i) any leave of absence approved by the Board or chief executive officer, including sick leave, military leave or any other personal leave, or (ii) transfers between the Company, an Affiliate, or their successors. Notwithstanding the foregoing, a leave of absence will be treated as Continuous Service for purposes of vesting in a Stock Award only to such extent as may be provided in the Company's leave of absence policy, in the written terms of any leave of absence agreement or policy applicable to the Participant, or as otherwise required by law.

(n)    " *Corporate Transaction* " means the consummation, in a single transaction or in a series of related transactions, of any one or more of the following events:

(i)    a sale or other disposition of all or substantially all, as determined by the Board, in its sole discretion, of the consolidated assets of the Company and its Subsidiaries;

(ii)    a sale or other disposition of at least ninety percent (90%) of the outstanding securities of the Company;

(iii)    a merger, consolidation or similar transaction following which the Company is not the surviving corporation; or

(iv)    a merger, consolidation or similar transaction following which the Company is the surviving corporation but the shares of Common Stock outstanding immediately preceding the merger, consolidation or similar transaction are converted or exchanged by virtue of the merger, consolidation or similar transaction into other property, whether in the form of securities, cash or otherwise.

(o)    " *Covered Employee* " will have the meaning provided in Section 162(m)(3) of the Code.

(p)    " *Director* " means a member of the Board.

(q)    " *Disability* " means, with respect to a Participant, the inability of such Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months, as provided in Sections 22(e)(3) and 409A(a)(2)(c)(i) of the Code, and will be determined by the Board on the basis of such medical evidence as the Board deems warranted under the circumstances.

(r)    " *Effective Date* " means the effective date of the Plan, which is the date of the annual meeting of stockholders of the Company held in 2014; *provided* , that the Plan is approved by the Company's stockholders at such meeting.

(s)    " *Employee* " means any person employed by the Company or an Affiliate. However, service solely as a Director, or payment of a fee for such services, will not cause a Director to be considered an "Employee" for purposes of the Plan.

(t)    " *Entity* " means a corporation, partnership, limited liability company or other entity.

(u)    " *Exchange Act* " means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(v)    " *Exchange Act Person* " means any natural person, Entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act), except that "Exchange Act Person" will not include

A-19

(i) the Company or any Subsidiary of the Company, (ii) any employee benefit plan of the Company or any Subsidiary of the Company or any trustee or other fiduciary holding securities under an employee benefit plan of the Company or any Subsidiary of the Company, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, (iv) an Entity Owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their Ownership of stock of the Company; or (v) any natural person, Entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act) that, as of the Effective Date, is the Owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's then outstanding securities.

(w)   " *Fair Market Value* " means, as of any date, the value of the Common Stock determined as follows:

(i)   If the Common Stock is listed on any established stock exchange or traded on any established market, the Fair Market Value of a share of Common Stock will be, unless otherwise determined by the Board, the closing sales price for such stock as quoted on such exchange or market (or the exchange or market with the greatest volume of trading in the Common Stock) on the date of determination, as reported in a source the Board deems reliable.

(ii)   Unless otherwise provided by the Board, if there is no closing sales price for the Common Stock on the date of determination, then the Fair Market Value will be the closing selling price on the last preceding date for which such quotation exists.

(iii)   In the absence of such markets for the Common Stock, the Fair Market Value will be determined by the Board in good faith and in a manner that complies with Sections 409A and 422 of the Code.

(x)   " *Incentive Stock Option* " means an option granted pursuant to Section 5 that is intended to be, and that qualifies as, an "incentive stock option" within the meaning of Section 422 of the Code.

(y)   " *Non-Employee Director* " means a Director who either (i) is not a current employee or officer of the Company or an Affiliate, does not receive compensation, either directly or indirectly, from the Company or an Affiliate for services rendered as a consultant or in any capacity other than as a Director (except for an amount as to which disclosure would not be required under Item 404(a) of Regulation S-K promulgated pursuant to the Securities Act (" *Regulation S-K* ")), does not possess an interest in any other transaction for which disclosure would be required under Item 404(a) of Regulation S-K, and is not engaged in a business relationship for which disclosure would be required pursuant to Item 404 (b) of Regulation S-K; or (ii) is otherwise considered a "non-employee director" for purposes of Rule 16b-3.

(z)   " *Nonstatutory Stock Option* " means any option granted pursuant to Section 5 that does not qualify as an Incentive Stock Option.

(aa)   " *Officer* " means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act.

(bb)   " *Option* " means an Incentive Stock Option or a Nonstatutory Stock Option to purchase shares of Common Stock granted pursuant to the Plan.

(cc)   " *Option Agreement* " means a written agreement between the Company and an Optionholder evidencing the terms and conditions of an Option grant. Each Option Agreement will be subject to the terms and conditions of the Plan.

(dd)   " *Optionholder* " means a person to whom an Option is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Option.

(ee)   " *Other Stock Award* " means an award based in whole or in part by reference to the Common Stock which is granted pursuant to the terms and conditions of Section 6(d).

(ff)   " *Other Stock Award Agreement* " means a written agreement between the Company and a holder of an Other Stock Award evidencing the terms and conditions of an Other Stock Award grant. Each Other Stock Award Agreement will be subject to the terms and conditions of the Plan.

(gg)   " *Outside Director* " means a Director who either (i) is not a current employee of the Company or an "affiliated corporation" (within the meaning of Treasury Regulations promulgated under Section 162(m) of the Code), is not a former employee of the Company or an "affiliated corporation" who receives compensation for prior services (other than benefits under a tax-qualified retirement plan) during the taxable year, has not been an officer of the Company or an "affiliated corporation," and does not receive remuneration from the Company or an "affiliated corporation," either directly or indirectly, in any capacity other than as a Director, or (ii) is otherwise considered an "outside director" for purposes of Section 162(m) of the Code.

(hh)   " *Own,* " " *Owned,* " " *Owner,* " " *Ownership* " A person or Entity will be deemed to "Own," to have "Owned," to be the "Owner" of, or to have acquired "Ownership" of securities if such person or Entity, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares voting power, which includes the power to vote or to direct the voting, with respect to such securities.

(ii)   " *Participant* " means a person to whom an Award is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Stock Award.

(jj)   " *Performance Cash Award* " means an award of cash granted pursuant to the terms and conditions of Section 6(c)(ii).

(kk)   " *Performance Criteria* " means the one or more criteria that the Board will select for purposes of establishing the Performance Goals for a Performance Period. The Performance Criteria that will be used to establish such Performance Goals may be based on any one of, or combination of, the following as determined by the Board: (i) earnings (including earnings per share and net earnings); (ii) earnings before interest, taxes and depreciation; (iii) earnings before interest, taxes, depreciation and amortization (" *EBITDA* "); (iv) growth of earnings before interest and taxes; (iv) EBITDA margin, adjusted EBITDA margin, or adjusted EBITDA; (v) total stockholder return; (vi) return on equity or average stockholder's equity; (vii) return on assets, net assets, investment, or capital employed; (viii) stock price; (ix) margin (including gross margin); (x) income (before or after taxes); (xi) net income or operating income; (xii) operating income after taxes; (xiii) pre-tax profit or after-tax profit; (xiv) operating cash flow; (xv) revenue or sales (including revenue or sales targets); (xvi) increases in revenue or product revenue; (xvii) expenses and costs (including expenses and cost reduction goals); (xviii) improvement in or attainment of working capital levels; (xix) economic value added (or an equivalent metric); (xx) market share; (xxi) cash flow; (xxii) cash flow per share; (xxiii) earnings per share; (xxiv) share price or share price performance; (xxv) debt reduction; (xxvi) implementation or completion of projects or processes; (xxvii) customer satisfaction; (xxviii) number of customers; (xxix) stockholders' equity; (xxx) return on stockholders' equity; (xxxi) capital expenditures; (xxxii) debt levels; (xxxiii) operating profit or net operating profit; (xxxiv) workforce diversity; (xxxv) growth of net income or operating income; (xxxvi) billings; (xxxvii) days sales outstanding; and (xxxviii) to the extent that an Award is not intended to comply with Section 162(m) of the Code, other measures of performance selected by the Board.

(ll)   " *Performance Goals* " means, for a Performance Period, the one or more goals established by the Board for the Performance Period based upon one or more Performance Criteria. Except as specifically provided otherwise by the Board or the Committee, as applicable, the Performance Criteria shall have the same meanings as used in the Company's financial statements, or, if such terms are not

A-21

used in the Company's financial statements, they shall have the meaning applied pursuant to generally accepted accounting principles, or as used generally in the Company's industry. Performance Goals may be based on a Company-wide basis, with respect to one or more business units, divisions, Affiliates, or business segments, and in either absolute terms or relative to the performance of one or more comparable companies or the performance of one or more relevant indices. Unless specified otherwise by the Board (i) in the Award Agreement at the time the Award is granted or (ii) in such other document setting forth the Performance Goals at the time the Performance Goals are established, the Board will appropriately make adjustments in the method of calculating the attainment of Performance Goals for a Performance Period as follows: (1) to exclude restructuring and/or other nonrecurring charges; (2) to exclude exchange rate effects, as applicable, for non-U.S. dollar denominated Performance Goals; (3) to exclude the effects of changes to generally accepted accounting principles; (4) to exclude the effects of any statutory adjustments to corporate tax rates; and (5) to exclude the effects of any "extraordinary items" as determined under generally accepted accounting principles.

(mm)   " *Performance Period* " means the period of time selected by the Board over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to and the payment of a Stock Award or a Performance Cash Award. Performance Periods may be of varying and overlapping duration, at the sole discretion of the Board.

(nn)   " *Performance Stock Award* " means a Stock Award granted under the terms and conditions of Section 6(c)(i).

(oo)   " *Person* " means any natural person, association, trust, business trust, cooperative, corporation, general partnership, joint venture, joint-stock company, limited partnership, limited liability company, real estate investment trust, regulatory body, governmental agency or instrumentality, unincorporated organization or organizational entity.

(pp)   " *Plan* " means this Kratos Defense & Security Solutions, Incorporated 2014 Equity Incentive Plan.

(qq)   " *Restricted Stock Award* " means an award of shares of Common Stock which is granted pursuant to the terms and conditions of Section 6(a).

(rr)   " *Restricted Stock Award Agreement* " means a written agreement between the Company and a holder of a Restricted Stock Award evidencing the terms and conditions of a Restricted Stock Award grant. Each Restricted Stock Award Agreement will be subject to the terms and conditions of the Plan.

(ss)   " *Restricted Stock Unit Award* " means a right to receive shares of Common Stock which is granted pursuant to the terms and conditions of Section 6(b).

(tt)   " *Restricted Stock Unit Award Agreement* " means a written agreement between the Company and a holder of a Restricted Stock Unit Award evidencing the terms and conditions of a Restricted Stock Unit Award grant. Each Restricted Stock Unit Award Agreement will be subject to the terms and conditions of the Plan.

(uu)   " *Rule 16b-3* " means Rule 16b-3 promulgated under the Exchange Act or any successor to Rule 16b-3, as in effect from time to time.

(vv)   " *Rule 405* " means Rule 405 promulgated under the Securities Act.

(ww)   " *Rule 701* " means Rule 701 promulgated under the Securities Act.

(xx)   " *Securities Act* " means the Securities Act of 1933, as amended.

(yy)   " *Stock Appreciation Right* " or " *SAR* " means a right to receive the appreciation on Common Stock that is granted pursuant to the terms and conditions of Section 5.

(zz)   " *Stock Appreciation Right Agreement* " means a written agreement between the Company and a holder of a Stock Appreciation Right evidencing the terms and conditions of a Stock Appreciation Right grant. Each Stock Appreciation Right Agreement will be subject to the terms and conditions of the Plan.

(aaa)   " *Stock Award* " means any right to receive Common Stock granted under the Plan, including an Incentive Stock Option, a Nonstatutory Stock Option, a Restricted Stock Award, a Restricted Stock Unit Award, a Stock Appreciation Right, a Performance Stock Award or any Other Stock Award.

(bbb)   " *Stock Award Agreement* " means a written agreement between the Company and a Participant evidencing the terms and conditions of a Stock Award grant. Each Stock Award Agreement will be subject to the terms and conditions of the Plan.

(ccc)   " *Subsidiary* " means, with respect to the Company, (i) any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, stock of any other class or classes of such corporation will have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, Owned by the Company, and (ii) any partnership, limited liability company or other entity in which the Company has a direct or indirect interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%).

(ddd)   " *Ten Percent Stockholder* " means a person who Owns (or is deemed to Own pursuant to Section 424(d) of the Code) stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Affiliate.

A-23

# EXHIBIT E



FROM STRENGTH TO SUCCESS

**SEPARATION AGREEMENT & GENERAL RELEASE**

**CONFIDENTIAL**

March 27, 2015

Wayne Armstrong
2616 Blakesley Way
Roseville, CA  95747

Re:      **Separation Agreement and General Release**

Dear Wayne,

This letter proposes the following Separation Agreement and General Release (the "Agreement") between you and Kratos Defense & Security Solutions, Inc., including all of its past, present and future parent companies, subsidiaries and affiliates, (the "Company") regarding the terms of your separation from the Company.

A.  Background

1.  The Company employed you as Chief Operating Officer, Unmanned Systems Division and General Manager, Composite Engineering, Inc.  You and the Company agreed to terminate your employment relationship on an amicable basis.

2.  On March 27, 2015 (the "Termination Date"), your full time employment with the Company will terminate.

3.  Even if you do not sign this Agreement, the Company will pay (or has already paid) you the compensation that you will have earned through the Termination Date and any accrued Paid Time Off benefits in accordance with the terms and conditions of that plan.

4.  Similarly, even if you do not sign the Agreement, you will be offered benefits to which you are entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  If you are currently enrolled in the Company's medical, dental and/or vision plans, your coverage will be continued through the last day of your employment at no additional cost to you.

5.  Upon the Termination Date you will immediately, if you have not already done so, return all of the Company's property in your possession including, but not limited to, materials such as employee contact lists, customer lists, mailing lists, account information, proposals, contracts, work product, price lists and pricing information, any phone cards, mobile phone, computer equipment, computer software and all of the tangible and intangible property belonging to the Company and relating to your employment with the Company.  You further represent and warrant that you have not retained any copies, electronic or otherwise, of such property.

6.  You acknowledge that you have complied and will continue to comply with the terms of any confidentiality, proprietary information, or non-solicitation agreement that exists between you and the Company (each a "Prior Agreement") and know and understand that the obligations contained in such a Prior Agreement survive execution of this Agreement and your termination of employment. Even if you did not sign such a Prior Agreement, you understand that you shall not directly or indirectly misappropriate, disclose to any other person or entity, or use in any manner detrimental to the Company any confidential, proprietary or trade secret information of the Company.  Confidential, proprietary or trade secret information specifically includes, without limitation, cost and pricing data, margins, employee contact information, teaming partner and contractor information, pending bids and proposals, customer lists, identity of key customer contacts

1

WB 3/27/15

and customer profiles and business preferences, marketing data, business strategy, methods, techniques, *processes and programs from which the Company* derives economic value which are not generally known to other companies and which the Company exerts reasonable efforts to maintain secret that you acquired as an employee of the Company. You understand your duty to maintain the secrecy of the Company's confidential, proprietary and trade secret information and that this obligation survives execution of this Agreement and your termination of employment. In particular, you shall not disclose any confidential, proprietary or trade secret information which you acquired as an employee of the Company to any other person or entity, or use such information in any manner that is detrimental to the interest of the Company, and you acknowledge that such information has independent and significant economic value to the Company.

Additionally, you hereby acknowledge and agree that all innovations, inventions, discoveries, improvements, devices, designs, practices, processes, methods, products or services ("Innovations") that you made, developed, perfected, devised or reduced to practice during your period of employment with the Company, and for a period of 12 months after termination if based upon the confidential or proprietary information of the Company, that relate to the business, products, practices or techniques of the Company or its actual or demonstrably anticipated research or development, or results from any work you performed for the Company, are the Company's sole property and that you have assigned and hereby assign and agree to assign to the Company, its successors and assigns, any and all of your right, title and interest in and to any and all of said Innovations, and any copyright, trademark, patent applications or patents thereon. As a result, you acknowledge and agree that the Company retains legal ownership of the product of your work and no work product created by you while employed by the Company can be claimed, *construed, or presented as your property, even after termination of your employment.* Such Innovations shall be considered the Company's confidential, proprietary or trade secret information subject to the restrictions described above.

B. Terms of Agreement

In order to effect the termination of your employment and to provide you with certain benefits that you would not otherwise be entitled to, you and the Company agree as follows:

1. This Agreement shall not be in any way construed as an admission by the Company that it has acted wrongfully with respect to you or any other person, or that you have any rights whatsoever against the Company.

2. In consideration for the promises contained in this Agreement and release of claims as set forth below, and provided that you sign this Agreement and return it to me on or before May 11, 2015 and do not revoke this Agreement as set forth in Section B.10(d):

   a. The Company will pay you a total severance benefit of $135,000 payable on a bi-weekly basis, with deductions taken out in accordance with the Company's customary payroll process. This payment will be reflected in your W2 form.

   b. The Company will make available continued medical and dental benefits under COBRA, for you and eligible family members, at the employee contribution rate in effect at that time, through December 31, 2015.

   c. Other than the payments described in this Section B.2, any compensation listed under Section A and any rights accrued to you under the Company's employee stock plans, if applicable, no other payment or form of payment will be due to you from the Company.

   d. The company will reimburse you up to the amount of $19,000 in relocation expenses. You will need to produce receipts for any requested reimbursement.

   e. If you are unable to be released from your existing condominium rental agreement, the Company will reimburse you for the lease payments on a monthly basis for the remainder of the current lease term.

else. You also agree not to make any statement, written or oral, which disparages the Company, its services or products, or any of its directors, officers, employees, or agents.

6. This Agreement shall be binding on the parties and upon their heirs, administrators, representatives, executors, successors and assigns and shall inure to their benefit and to that of their heirs, administrators, representatives, executors, successors, and assigns.

7. You agree to cooperate fully with the Company in its defense of or other participation in any administrative, judicial or other proceeding, inquiry or investigation arising from any charge, complaint, or other action that has been or may be filed. You further agree to testify truthfully in any such proceedings.

8. You agree that you will not make any comments relating to the Company or its employees which are critical, derogatory or which may tend to injure the business of the Company.

9. In the event that you breach any of your obligations under Section B.3 through B.8 any outstanding obligations of the Company hereunder shall immediately terminate, and any payments previously made to you pursuant to Section B.2 shall be returned to the Company.

10. The Company hereby informs you in writing pursuant to the federal Older Workers Benefits Protection Act of 1990, as amended ("OWBPA") that:

    a. You should consult with an attorney before signing this Agreement;
    b. You do not waive rights or claims under the federal Age Discrimination in Employment Act that may arise after the date this waiver is executed;
    c. You have 21 days from the date of this letter to consider this Agreement. If you decide not to use the full 21 days, then you hereby knowingly and voluntarily waive any claims that you were not in fact given that period of time or did not use the entire 21 days to consult an attorney and/or consider this Agreement;
    d. You have 7 days after signing this Agreement to revoke the Agreement, and the Agreement will not be effective until that revocation period has expired; and
    e. Nothing in this Agreement limits or precludes your right to contest the validity of this Agreement under OWBPA.

11. The provisions of this Agreement are severable. If any provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.

12. This Agreement sets forth the entire agreement between you and the Company and supersedes any and all prior oral or written agreements or understandings between you and the Company concerning the subject matter of this Agreement, except for the Invention, Copyright, Non-Compete and Confidentiality Agreement and any Prior Agreement that may exist between you and the Company, which remain in full force and effect. This Agreement may not be altered, amended or modified, except by a further written document signed by you and the Company.

13. You represent that you fully understand your right to review all aspects of this Agreement with an attorney of your choice, that you have had the opportunity to consult with an attorney of your choice, that you have carefully read and fully understand all the provisions of this Agreement and that you are freely, knowingly and voluntarily entering into this Agreement.

If you are willing to enter into this Agreement, please signify your acceptance in the space indicated below, and return it to me by May 11, 2015. Assuming you accept this Agreement, the Company will provide the severance benefits described in Section B.2.a within a reasonable time frame from the date the Agreement becomes effective. You acknowledge that you would not be entitled to receive any of the benefits set forth in Section B.2 absent this Agreement.

PLEASE READ CAREFULLY, YOU ARE GIVING UP ANY LEGAL CLAIMS THAT YOU HAVE AGAINST THE COMPANY BY SIGNING THIS AGREEMENT.

4

Very truly yours,

Jerry Beaman
President, Unmanned Systems Division
Kratos Defense & Security Solutions, Inc.

cc:  Employee file

Accepted and agreed to on this _27_ day of _MARCH_ , 2015

Signature: _Wayne Q Armstrong_

Print Name: _WAYNE L. ARMSTRONG_

Witness Signature: _[signature]_

Print Name: _Jen Hendrickson_          Date: _4/10/15_

5

## EXHIBIT F

**KRATOS DEFENSE & SECURITY SOLUTIONS, INC.**

**AMENDMENT TO RESTRICTED STOCK UNIT AGREEMENTS**

THIS AMENDMENT (the "Amendment") is made and entered into effective March 27, 2015, between Kratos Defense & Security Solutions, Inc. (the "Company") and Wayne Armstrong (the "Grantee"). Terms used but not defined herein shall have the meaning set forth in the respective restricted stock unit agreements described below.

WHEREAS, the Company awarded Grantee restricted stock units ("RSUs") as described in Exhibit A attached hereto (collectively referred to herein as the "Awards");

WHEREAS, pursuant to the terms of the Restricted Stock Unit Agreements governing each Award (collectively referred to herein as the "RSU Agreements"), the unvested RSUs are immediately forfeited and cancelled upon the termination of Grantee's Continuous Service; and

WHEREAS, the Company wishes to amended the RSU Agreements such that the RSUs will not be forfeited and cancelled when Grantee's Continuous Service terminates upon his retirement on March 27, 2015.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Company and Grantee hereby agree as follows:

1.  Amendment of RSU Agreements.

    a.  The RSU Agreements are hereby amended such that (i) Grantee's provision of services as an employee or Continuous Service as of each vesting date are no longer requirements, (ii) the terms of Section 4 of the RSU Agreements will have no further force and effect, (iii) and Grantee's termination of his Continuous Service from his March 27, 2015 retirement will not cause his unvested RSU Awards to be forfeited, canceled, null, and void.

    b.  The vesting terms of the RSU Agreements shall be amended as set forth in Exhibit A under "Amended Vesting Terms."

    c.  The vesting terms upon a Change in Control shall remain the same as set forth under Section 5 the RSU Agreements except that such Change in Control must occur prior to March 27, 2020.

    d.  Any unvested RSUs under the Awards will be forfeited, cancelled, null and void if such RSUs have not vested and if no Change in Control has occurred by March 27, 2020.

2.  No Changes.  Except as amended hereby, all remaining terms and conditions of the Awards shall remain in full force and effect and shall be unchanged hereby.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized representatives effective as of the date first set forth above.

GRANTEE:

WAYNE ARMSTRONG

Signature                5/19/15

KRATOS DEFENSE & SECURITY SOLUTIONS, INC.

Name & Title:

**EXHIBIT A**

| Grant Date | Grant Number | Number of RSUs Granted | Number of RSUs Unvested | Original Vesting Terms | Amended Vesting Terms |
|---|---|---|---|---|---|
| 3/30/2012 | RS000311 | 5,200 | 5,200 | Vest 100% on the 5 year anniversary of 10/1/2012 | 5,200 RSUs will vest 20% on each anniversary of 3/27/2015 |
| 7/19/2013 | RN000216 | 6,680 | 4,000 | 2,000 RSUs vest on 3/30/2014 and each anniversary thereafter | 4,000 RSUs will vest 20% on each anniversary of 3/27/2015 |
| 1/3/2014 | RS000376 | 10,000 | 10,000 | Vest 100% on the 5 year anniversary from the date of grant 1/3/2014. | 10,000 RSUs will vest 20% on each anniversary of 3/27/2015 |
| 1/3/2014 | RS000396 | 10,000 | 8,000 | 2,000 RSUs vest when the Company's common stock closing price meets each of the following milestones: $8.91, $9.72, $10.53, $11.34, and $12.15, within 10 years from the date of grant. | 2,000 RSUs will vest when the Company's common stock closing price meets each of the following milestones: $9.72, $10.53, $11.34, and $12.15, provided that such milestones are met before 3/27/2020. Any unvested RSUs will be forfeited, cancelled, null and void after 3/27/2020. |

